UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRANCIS E. DYBES, AND OTHERS SIMILARLY SITUATED, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. FILE NO. 04 CV 10076 MLW |
| DELTA ELEVATOR SERVICE CORPORATION d/b/a DELTA/BECKWITH ELEVATOR COMPANY, | ) ) ) ) ) | |
| Defendants | ) | |

## **MOTION TO DISMISS**

Defendant Delta Elevator Service Corporation d/b/a/ Delta/Beckwith Elevator Company

("Defendant") moves to dismiss the plaintiff's Complaint in its entirety pursuant to Rule 12(b)(1)

and (6) of the Federal Rules of Procedure. This Court should dismiss plaintiff's Complaint

because the claim involves a dispute that arises from a collective bargaining agreement and it

alleges conduct that is prohibited as an unfair labor practice. As a result, although plaintiff

brought the claim under Massachusetts state law, the claim is preempted by the Labor

Management Relations Act, 29 U.S.C. §141 *et seq.* Defendant submits the following

Memorandum of Law and Declaration of Jonathan Brink in support of its Motion to Dismiss.

DOWNS
RACHLIN
MARTIN PLLC

## LOCAL RULE 7.1(A)(2) CERTIFICATION

Pursuant to Local Rule 7.1(A)(2), undersigned counsel certifies that she has in good faith requested plaintiffs' counsel to consent to dismiss the claim brought against Defendant. The request was made orally on January 13, 2004. Undersigned counsel sent plaintiffs' counsel a copy of this Motion to Dismiss via facsimile on January 14, 2004 and inquired whether counsel would consent to dismissing the claim brought against Defendant. Since faxing the draft motion to plaintiffs' counsel, counsel have spoken but have not reached a resolution.

## MEMORANDUM OF LAW

### I.    BACKGROUND

Plaintiff is employed as an elevator service mechanic for Defendant. Complaint ¶ 1. Plaintiff's collective bargaining representative is the International Union of Elevator Constructors, Local 4, AFL-CIO (the "Union"). Complaint ¶ 6. North American Elevator Services ("NAES"), on behalf of itself and its wholly owned subsidiaries including Defendant, and the Union have entered into a collective bargaining agreement, which became effective July 9, 2002 and remains in full force and effect until July 8, 2007 (the "Agreement"). Declaration of Jonathan Brink ("Brink Decl.") ¶ 5, Exhibit A.[1] The Agreement includes provisions regarding paid holidays (Article VI) and a grievance and arbitration procedure (Article XV). *Id.*.

In October 2002, a dispute arose under the Agreement concerning whether certain employees covered by the Agreement were entitled to pay for the Columbus Day holiday in 2002. Brink Decl. ¶ 7. On November 4, 2002, the Union, through its attorneys Segal, Roitman & Coleman, filed an unfair labor practice charge with the National Labor Relations Board, alleging a violation of section 8(a)(1) and 8(a)(5) of the National Labor Relations Act due to

---

[1]    While the Agreement was not attached to the Complaint, it is appropriate for the Court to consider the Agreement. *See* discussion in section II, Standard of Review, *infra*.

DOWNS
RACHLIN
MARTIN PLLC                    2

Delta's failure to pay this holiday pay. Brink Decl. ¶ 8, Exhibit B ("ULP Charge"). Pursuant to the Agreement between Defendant and the Union, the parties submitted the question whether Delta was obligated to pay certain employees for the 2002 Columbus Day holiday to final and binding arbitration. Complaint ¶ 6; Brink Decl. ¶ 9. The Arbitrator's Award held that, pursuant to past practice, certain employees were entitled to pay for the 2002 Columbus Day holiday. Brink Decl. ¶ 9, Exhibit C.[2]

Defendant did not pay plaintiff holiday pay for Columbus Day in 2003. Complaint ¶ 8. Plaintiff filed this lawsuit on or about December 22, 2003 in the District Court Department of the Trial Court, Roxbury Division. On January 12, 2004, Defendant removed the case to Federal District Court for the District of Massachusetts.

## II.    STANDARD OF REVIEW

Under Fed.R.Civ.P. 12(b)(6), the court considers the legal sufficiency of the claim as stated in the complaint. The Court will not dismiss the complaint unless the allegations are such that "the plaintiff can prove no set of facts to support [the] claim for relief." *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 30 (1st Cir. 2000). Taking plaintiff's allegations as true, the Court must construe the complaint in the light most favorable to plaintiff and must draw all inferences in plaintiff's favor. *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins.Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

Generally, in ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court may not consider documents that are not incorporated into or made an exhibit to the complaint, unless the motion is converted to a motion for summary judgment. *Id.* However, an exception may be made "for documents the authenticity of which are not disputed by the parties; . . . for

---

[2] The ULP Charge and the Award of the Arbitrator also were not attached to the Complaint. However, for the reasons stated in section II, the Court should consider these documents when deciding this motion.

documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *Id.*; *Kling v. Fidelity Management Trust Co.*, 270 F.Supp. 2d 121, 128 (D.Mass. 2003).  In reviewing a motion to dismiss, it is well-established that the court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Clorox Co.*, 228 F.3d at 32.

Thus, it is proper for the Court to consider the Agreement and the Award of the Arbitrator because plaintiff specifically referred to these documents in the Complaint. Complaint ¶¶ 5, 6.  Further, the Court may properly consider the ULP Charge because plaintiff cannot dispute the authenticity of the document.

## III.  **ARGUMENT**

### **Plaintiff's Claim Is Preempted By The Labor Management Relations Act Both Because It Is Based On A Claim Of Rights Under A Collective Bargaining Agreement and Because It Alleges Conduct That Is Prohibited As An Unfair Labor Practice.**

#### A.    **Plaintiff's Claim Is Based On A Claim Of Rights Under A Collective Bargaining Agreement**

When "resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . .  or dismissed as pre-empted by federal labor-contract law." *Allis Chalmers Corp. v. Lueck,* 471 U.S. 202, 220 (1985) (section 301 preempted state tort claim alleging bad faith in handling a disability insurance claim).[3]  *See also Sullivan v. Raytheon Co.,* 262 F.3d 41 (1st Cir. 2001) (retaliation claim brought under Massachusetts law preempted

---

[3]   Section 301 provides in relevant part: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties."  29 U.S.C. §185(a).

because it would require interpretation of collective bargaining agreement), *cert. denied* 534 U.S. 1118 (2002).[4] This principle applies equally to a state-law claim for payment of wages when resolution of the claim depends upon analysis of the terms of a collective bargaining agreement. *See Firestone v. S. Cal. Gas Co.*, 219 F.3d 1063 (9th Cir. 2000) (claim under state law for overtime pay was preempted), *cert. denied* 2002 U.S. LEXIS 4940 (2002); *Wheeler v. Graco Trucking Corp.*, 985 F.2d 108 (3d Cir. 1993) (section 301 preempted claim under wage payment statute because obligation to pay wages depended on application of the collective bargaining agreement); *Arnold v. Cabot Corp.*, 2000 U.S. Dist. LEXIS 7709 (N.D.W.Va. 2000) (section 301 preempts state law wage claim).

Plaintiff claims that he was entitled to pay for the Columbus Day holiday in 2003. Complaint ¶¶ 1, 7. Although plaintiff couched his claim as one under the Massachusetts payment of wages statute, the resolution of the claim requires a determination in the first instance whether plaintiff was entitled to pay for this holiday. Any entitlement to pay would arise from the Agreement, which specifically identifies the paid holidays. Brink Decl., Ex. A, Art. VI. Clearly, this determination requires interpretation of the Agreement. Thus, plaintiff's claim is preempted by section 301, and should be dismissed.

---

[4] A complaint, like the Complaint in the instant case, that is "artfully pleaded" in an attempt to avoid federal jurisdiction may be recharacterized as one arising under federal law. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 831 (1st Cir. 1997) ("the artful pleading doctrine permits a district court to recharacterize a putative state-law claim as a federal claim when a review of the complaint, taken in context, reveals a colorable federal question within a field in which state law is completely preempted"); *Giannetti v. Mahoney*, 218 F. Supp. 2d 8, 11 (D. Mass. 2002) (quoting *BIW Deceived*).

**B.    Plaintiff's Claim Alleges Conduct That Is Prohibited As An Unfair Labor Practice**

Section 7 of the Labor Management Relations Act ("LMRA") provides employees the

"right to self-organization" and Section 8 prohibits an employer from, among other things,

interfering or coercing employees in their rights "to form, join or assist labor organizations," and

from refusing to bargain collectively with the representatives of his employees.  29 U.S.C.

§§157, 158(a)(1) and (5).  Congress created a substantive rule of law and specifically created the

National Labor Relations Board ("NLRB") to protect and administer the rights created by the

LMRA.  29 U.S.C. § 153; *Int'l Longshoremen's Association v. Davis*, 476 U.S. 380, 389 (1986);

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243-45 (1959); *Garner v.*

*Teamsters, Chauffeurs & Helpers, Local Union*, 346 U.S. 485 (1953); *Chaulk Servs. v.*

*Massachusetts Comm'n Against Discrimination*, 70 F.3d 1361, 1364 (1st Cir. 1995).

Over fifty years ago, the United States Supreme Court held that federal law preempted

state jurisdiction over matters that are clearly or arguably protected under the LMRA or

prohibited as an unfair labor practice and set forth the basis for the LMRA's broad preemptive

scope:

> Congress did not merely lay down a substantive rule of law to be
> enforced by any tribunal competent to apply law generally to the
> parties.  It went on to confide primary interpretation and
> application of its rules to a specific and specially constituted
> tribunal and prescribed a particular procedure for investigation,
> complaint and notice, and hearing and decision, including judicial
> relief pending a final administrative order.  Congress evidently
> considered that centralized administration of specially designed
> procedures was necessary to obtain uniform application of its
> substantive rules and to avoid these diversities and conflicts likely
> to result from a variety of local procedures and attitudes toward
> labor controversies . . ..  A multiplicity of tribunals and a diversity

DOWNS
RACHLIN
MARTIN PLLC                          6

> of procedures are quite as apt to produce incompatible or
> conflicting adjudications as are different rules of substantive law.

*Garner v. Teamsters*, 346 U.S. at 490-91, quoted in *Davis*, 476 U.S. at 389;[5] *see Chaulk Servs.*, 70 F.3d at 1364 (discussing *Garner*); *Teamsters, Chauffeurs, etc., Local Union 49 v. West Coast Industrial Relations Asso.*, 1989 U.S. Dist. LEXIS 3119 at *9 (D. Mass. Mar. 30, 1989) (quoting excerpt from *Garner*); *Operation & Maintenance Service, Inc. Westover Job Corps Center/G.E. v. Labor Relations Com.*, 405 Mass. 214, 216 (1989) ("The [LMRA] generally precludes State courts and agencies from assuming jurisdiction over matters placed within the competence of the NLRB.")

Since *Garner*, the U.S. Supreme Court has consistently and repeatedly held that state and federal courts must defer to the exclusive competence of the National Labor Relations Board "when the activities sought to be regulated are clearly or may fairly be assumed to be within the purview of § 7 or § 8." *Davis*, 476 U.S. at 389; *San Diego Building v. Garmon*, 359 U.S. at 245;[6] *Chaulk Servs.*, 70 F.3d at 1364 (state and federal courts must defer to NLRB "when an activity is arguably subject to § 7 or § 8 of the [LMRA]"); *Mulvihill v. Spalding Sports Worldwide, Inc.*, 184 F. Supp. 2d 99, 102 (D. Mass. 2002) (quoting *Chaulk Servs.*). Federal law preempts state jurisdiction over arguably protected and prohibited practices whether the state action is for damages or injunctive relief. *San Diego Building v. Garmon*, 359 U.S. at 245.

Application of the preemption doctrine depends on the nature of the conduct at issue not on the legal theories that plaintiff chooses to frame a claim. *See Amalgamated Ass'n of St., Elec.*

---

[5] In Garner, the Supreme Court held that a Pennsylvania state court did not have jurisdiction to issue an injunction restraining peaceful picketing because the NLRB was vested with the power to decide the matter. The NLRB is vested with the power to decide whether Plaintiff was discharged for his union activity; thus federal law preempted the trial court's jurisdiction.

[6] In Garmon, the Supreme Court held that a California state court did not have jurisdiction to award damages against a union for picketing when the activity was protected by § 7 of the NLRA or constituted an unfair labor practice under § 8 of the NLRA. Plaintiff's union activity would have been protected. It would have been an unfair labor practice to discharge him for his union activity. Thus, the trial court did not have jurisdiction over this matter.

DOWNS
RACHLIN
MARTIN PLLC                                7

*Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 292 (1971) ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern"); *Chaulk Servs.*, 70 F.3d at 1365 (quoting *Lockridge*).

The crux of plaintiff's claim, and the only issue, is that he was not paid for the 2003 Columbus Day holiday. It is telling that the Union filed a ULP Charge against Defendant in November 2002 when it did not pay for the 2002 Columbus Day holiday. In the ULP Charge, the Union alleged that the "employer unilaterally changed the terms and conditions of employment by failing to pay holiday pay to twenty-two bargaining unit employees," and that the employer engaged in an unfair labor practice within the meaning of section 8(a) and 8(a)(5) of the LMRA. Brink Decl., Ex. B. Plaintiff's claim in the instant case is identical, except that it seeks pay for the holiday in 2003.

"In the end, no recharacterization of this claim can obscure the fact that, at bottom, this is a classic example of an unfair labor practice claim of the kind traditionally handled in the first instance by the NLRB." *Chaulk Servs.*, 70 F.3d at 1367. Since plaintiff alleges that Defendant engaged in activity that is prohibited as an unfair labor practice, and within the purview of Section 8 of the LMRA, plaintiff's claim is preempted by the LMRA and the Court should dismiss the Complaint because it lacks jurisdiction.

WHEREFORE, Defendant respectfully request that this Court dismiss plaintiff's

Complaint in its entirety.

Burlington, Vermont.                          January 14, 2004

Patricia M. Sabalis
BBO # 436730
Downs Rachlin Martin PLLC
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

Attorneys for Delta Elevator Service
Corporation d/b/a/ Delta/Beckwith Elevator
Company

BTV.257716.2

# BRINK DECLARATION

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRANCIS E. DYBES, AND OTHERS SIMILARLY SITUATED, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. FILE NO. 04 CV 10076 MLW |
| DELTA ELEVATOR SERVICE CORPORATION d/b/a DELTA/BECKWITH ELEVATOR COMPANY | ) ) ) ) ) | |
| Defendants | ) | |

## DECLARATION OF JONATHAN BRINK

I, Jonathan Brink, declare as follows:

1.      I am making this declaration in connection with Delta Elevator Service Corporation d/b/a/ Delta/Beckwith Elevator Company's ("Delta") Motion to Dismiss. I am competent to testify to all of the facts stated in this affidavit. All of the following matters are true and correct to the best of my personal knowledge.

2.      I am the Senior Human Resources Manager for North American Elevator Services ("NAES"). Delta is a wholly owned subsidiary of NAES. As Senior Human Resources Manger, I am responsible for labor relations at Delta.

3.      Delta employs elevator constructor Mechanics, Helpers and Apprentices, including Francis E. Dybes, the named plaintiff in this case.

4.      The International Union of Elevator Constructors or and on behalf of its locals, including Local 4 of the International Union of Elevator Constructors (collectively referred to as the "Union") is the exclusive collective bargaining representative for elevator constructor Mechanics, Helpers and Apprentices, including plaintiff.

5.      NAES, on behalf of itself and its wholly owned subsidiaries including Delta, and the Union have entered into a collective bargaining agreement, which became effective July 9, 2002 and remains in full force and effect until July 8, 2007 (the "Agreement").

6.      The Agreement covers the terms and conditions of employment of elevator constructor Mechanics, Helpers and Apprentices employed by Delta, including plaintiff.  The Agreement includes provisions regarding Holidays (Article VI) and a grievance and arbitration procedure (Article XV).  A true and accurate copy of the relevant Articles of the Agreement is attached as Exhibit A.

7.      In October 2002, a dispute arose under the Agreement concerning whether Delta's elevator constructor Mechanics, Helpers and Apprentices were entitled to pay for the Columbus Day holiday in 2002.

8.      On November 4, 2002, the Union filed an unfair labor practice charge ("ULP") with the National Labor Relations Board, alleging a violation of section 8(a)(1) and 8(a)(5) of the National Labor Relations Act, due to Delta's failure to pay this holiday pay.  A true and accurate copy of the ULP is attached as Exhibit B.

- 2 -

9.    Pursuant to the Agreement between Delta and the Union, there was an arbitration hearing regarding the question whether Delta was obligated to pay certain employees for the Columbus Day holiday in 2002; the Arbitrator's Award held that, pursuant to past practice, certain employees were entitled to pay for Columbus Day in 2002. A true and accurate copy of the Award of Arbitrator is attached as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Farmington, Connecticut.                    January 13, 2004

_____
Jonathan Brink

BTV.257866.1

- 3 -

# EXHIBIT A

ThyssenKrupp, KONE, Schindler, Otis, Fujitec, the Elevator Contractors of America (ECA) Mitsubishi Elevator/Escalator Division, AMTECH Elevator Services, North American Elevator Services (NAES) and American Elevator Co., Inc. have signed individual agreements with the IUEC. Although the companies are identified individually in their agreements, the agreements are identical in content to the Master Agreement.

# MASTER COMPANY AGREEMENT
## WITH
## INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS

### July 9, 2002 to July 8, 2007

Whenever any words are used in this Agreement in the masculine gender they shall be construed as though they are also used in the feminine gender or neuter gender in all situations where they would so apply.

### INDEX

ARTICLE

| I | Parties to the Agreement |
| II | Recognition Clause |
| III | Membership Requirements |
| IV | Work Jurisdiction |
| IV(A) | Systems, Modular and Industrial Structure |
| V | Wages |
| VI | Holidays |
| VII | Construction Work |
| VIII | Repair Work |
| VIII (A) | Modernization Work |
| IX | Contract Service |
| X | Designation of Helpers Work and Qualifications |
| XI | System of Payment |

XII          Vacations

XIII         Traveling Time and Expenses

XIV          Strikes and Lockouts

XV           Arbitration

XVI          Jurisdictional Territory

XVII         Health Benefit Plan

XVIII        Pension Plan

XVIII (A)    401(k) Annuity

XIX          Educational Fund

XX           Elevator Industry Work Preservation Fund

XXI          Payment for Lost or Stolen Tools

XXI (A)      Metric Tools

XXII         Hiring, Layoffs and Transfers

XXIII        Scope and Terms of Agreement

XXIV         Re - Opening Clause

XXV          Termination of Agreement

XXVI         Local Option

XXVII        Reporting Time, Subpoenaed Witnesses, Uniforms

Appendix A   Decisions of the Joint Industry Committee

Appendix B   Apprenticeship Program

Letters of Agreement

Substance Abuse

# ARTICLE I

## Parties to the Agreement

This Agreement, made by and between the Company (hereinafter referred to as the "Company" or the "Employer") and the INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS (hereinafter referred to as "IUEC" or the "Union"), for the purpose of establishing harmonious relations and facilitating peaceful adjustment of wage schedules and working conditions. The INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS makes this Agreement for and on behalf of its affiliated local unions and a list of the local unions for which the International negotiates and executes this Agreement is attached hereto and made a part hereof.

## ARTICLE II

### Recognition Clause

**Par. 1**. The Union claims and the Employer acknowledges and agrees that the Union has supplied proof that a majority of its Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices have authorized the Union to represent them in collective bargaining with the Employer.

The Employer recognizes the Union as the exclusive Section 9(a) bargaining representative for all Elevator Constructor Mechanics and Elevator Constructor Helpers and Elevator Constructor Apprentices (hereinafter referred to sometimes as "Mechanics, Helpers and Apprentices") in the employ of the Company engaged in the installation, repair, modernization, maintenance and servicing of all equipment referred to in Article IV, Par. 2 and Article IV (A).

**Par. 2.** The Union recognizes that it is the responsibility of the Company in the interest of the purchaser, the Company and its employees to maintain the highest degree of operating efficiency and to continue technical development to obtain better quality, reliability, and cost of its product provided, however, that this provision is not intended to affect the work jurisdiction specified in Article IV and other Articles of the Agreement.

4

# ARTICLE III

## Membership Requirements

**Par. 1.** All Mechanics, Helpers and Apprentices covered by this Agreement shall, as a condition of employment obtain and maintain membership in a local union of the International Union of Elevator Constructors on and after the thirtieth (30th) day following the beginning of their employment or the date this Article becomes effective, whichever is later.

**Par. 2.** The Company shall be obligated under this Article, after it becomes effective as above provided, to terminate the employment of any employee who fails to obtain or maintain membership in a local union as required by this Article, upon receipt of a written request for such termination from his local union: except that the Company shall have the right to refuse such request if it has reasonable grounds for believing (1) that such membership is not available to the employee on the same terms and conditions generally applicable to other members, or (2) that membership has been denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

**Par. 3.** Employees working in any state which prohibits the execution or application of Agreements requiring membership in a labor organization as a condition of employment have the right to join or refrain from joining the International Union of Elevator Constructors. Employees who decide not to join the Union, however, and who are covered by this Agreement shall, as a condition of employment, be required to pay a monthly service fee to the Union. The service fee shall be the employees' prorata share of costs of collective bargaining and the handling of grievances and arbitrations. The service fee shall not include any prorata share of costs of items other than collective bargaining and handling of grievances and arbitrations, and under no circumstances will the service fee be used by the Union for any purpose other than to meet the expenses of collective bargaining and handling of grievances and arbitrations.

On and after the thirtieth (30th) day following the date of this Agreement or on and after the thirtieth (30th) day following the date of commencement of employment by an employee, whichever is later, regular tendering of the service fee shall be a condition of employment, subject to the rights of employees and obligations of parties under the law.

Service fees shall be payable on or before the first day of each month.

**Par. 4.** All of the provisions of this Article shall be effective to the extent permitted by applicable law.

## ARTICLE VI

### Holidays

**Par. 1.** The following shall be designated as paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Veterans Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day.

**Par. 2.** In addition, each local may retain established unpaid holidays already agreed upon by past procedure or observed by local building trades councils or declared by State or National Governments. Any new Federal holidays such as President's Day and Columbus Day are not to be considered as paid or unpaid holidays unless previously celebrated by the parties to this Agreement.

**Par. 3.** To be eligible for a paid holiday, an employee must have been on the Company's payroll within the calendar week, Sunday to Saturday inclusive, previous to the week in which the holiday occurs. "On the payroll" means that an employee must have performed actual work or have been on an authorized paid vacation. If an employee desires to extend his vacation beyond the earned paid vacation period, such extension of that time shall not be considered as "on the payroll".

**Par. 4.** The holiday provisions of this Article shall apply to all Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices engaged in construction, repair, modernization and contract service work as defined and covered in this Agreement.

**Par. 5.** Eligible employees shall be paid for the regular workday and the paid holidays enumerated in Par. 1 at the regular straight time rate of the classification worked prior to the observance of the holiday. The rate of pay for all work performed on paid holidays shall be at the double time rate in addition to the holiday pay. Any unpaid holidays observed as provided in Par. 2 shall be without pay, but if worked shall be double time rate.

**Par. 6.** When a paid holiday falls on Saturday, it shall be observed on Friday. When a paid holiday falls on Sunday, it shall be observed on Monday.

**Par. 7.** The Company shall not lay off or terminate an employee to circumvent holiday pay as provided herein.

**Par. 8.** Employees who work on a holiday that falls on a Saturday or Sunday and that holiday is observed on a Friday or Monday, respectively, shall be paid at the specified overtime rates for work performed on Saturdays or Sundays. (i.e., if July 4th falls on Saturday it will be celebrated on Friday, July 3rd. Work performed on July 3rd will be double time (2X) and work performed on July 4th will be paid at the specified overtime rate).

16

## ARTICLE XV

### Arbitration

**Par. 1.** Any difference or dispute regarding the application and construction of this Agreement, shall be referred to as a "grievance" and shall be resolved under the following procedure. Both parties commit to making an earnest effort to resolve differences in accordance with the procedure outlined below:

**Par. 2.** Oral Step. Any employee, local union, or the Employer with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Employer Representative (or Local Union Business Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Employer shall designate to each local union the Employer's Representative(s) for the purpose of responding to grievances at this step. If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.

Within three (3) working days after the above discussion, the Employer's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

The Local Business Representative shall similarly respond to the Employer's grievance.

**Par. 3.** Written Step One. If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.

Within fifteen (15) working days after the written grievance is received by the Employer (or the Union), a meeting will be held to discuss the grievance. The Employer shall be represented by the Regional Field Manager, Field Employee Relations or his designee and the designated Employer Representative described in Paragraph 2. The union shall be represented by the IUEC Regional Director or other Representative designated by the General President and the Local Business Representative described in Paragraph 2.

At the meeting (or any continuation thereof agreed to by the parties) the Employer (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Employer or the Union shall indicate on the grievance form whether it appeals therefrom. If the grievance disposition is not appealed, it shall be final and binding on all parties.

**Par. 4** Written Step Two. If the grievance is appealed it shall be placed on the agenda of a scheduled meeting of the National Arbitration Committee. The Employer shall be represented by the Director, Labor Relations or his designee and a panel of two (2) additional Employer Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.

The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.

The Director Labor Relations or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

**Par. 5.** Impartial Arbitration. If the grievance is not settled by the National Arbitration Committee, the Union or the Employer, within fifteen (15) working days of the Employer's (or Union's) disposition as outlined in Paragraph 4, may appeal the grievance to impartial arbitration. Such appeal shall take the form of a letter to the Director of Labor Relations (or the General President, IUEC).

**Par. 6.** The parties shall mutually agree upon the selection of an impartial arbitrator. If, within fifteen (15) days, the parties are unable to agree on the person to be selected as arbitrator, the parties shall jointly request to submit the matter to arbitration conducted in accordance with the Labor Arbitration Rules and Procedures of the American Arbitration Association and by an arbitrator who is a member of the National Academy of Arbitrators.

The arbitrator shall render his decision immediately upon the close of the record if the parties mutually agree otherwise the decision shall be rendered within thirty (30) days of the close of the record or the receipt of the briefs if the parties desire to file briefs. In an arbitration, either party may rely upon Articles in the Agreement other than those set forth in the original grievance form. The decision of the impartial arbitrator shall be final and binding on all parties.

**Par. 7.** It is understood that the arbitrator does not have the authority to add to, subtract from or modify in any way the provisions of this Agreement.

**Par. 8.** Grievances of the Union or the Employer shall originate at Written Step Two by submission to the Director of Labor Relations (or the General President, IUEC). The grievance of an IUEC Regional Director shall be filed and processed beginning at Written Step One of the procedure.

**Par. 9.** Discharge Grievances Expedited Impartial Arbitration. Recognizing the special nature of cases involving the discharge of an employee, the parties agree that such case(s) shall be handled as follows:

(a) Any discharge grievance not resolved at the Written Step One meeting may

38

immediately be referred by either party to the Director of Labor Relations or his designee and the General President, Union or his designee for their immediate review and discussion. Such grievance need not wait to be placed on the agenda of the scheduled National Arbitration Committee, but rather shall be discussed, either in person or by telephone, by the parties within ten (10) working days of the referral from Written Step One. The parties shall make an earnest effort to resolve their differences at this meeting, but failing such agreement, either party may request immediate, expedited impartial arbitration.

(b) Within ten (10) working days of a request for impartial arbitration by either party, the parties shall mutually agree upon the selection of an impartial arbitrator who shall be obliged to schedule a hearing at the earliest possible available date on his/her schedule where both parties are available to present their respective cases. The arbitrator shall hear the case. Post hearing briefs must be submitted within two (2) weeks of the conclusion of the hearing. The arbitrator shall render the award within two (2) weeks of the submission of briefs. Post hearing briefs may be waived by mutual agreement of the parties.

**Par. 10**. Compensation and expenses of the arbitrator shall be shared equally between the Employer and the Union.

**Par. 11**. Any of the time limits contained herein may be mutually extended by the representatives of the parties. Failure to appeal the grievance within the time limits described above without mutual agreement shall be considered an abandonment of the grievance. If a grievance is not dispositioned within the above time limits. it shall be immediately processed to the next step of the procedure.

## ARTICLE XXIII

### Scope and Terms of Agreement

**Par.** 1. This Agreement shall be binding upon the Company, and the local unions which are named in the attached lists. This Agreement shall be incorporated in and become a part of any Agreement entered into between the Company and the local unions of the International Union and no local Agreements between the Company and local unions shall be made changing this Agreement except as herein provided for in Article XXVI. No local union shall, through its by - laws, constitution, or otherwise, change any of the Articles or intent of this Agreement. Nor shall the Company make any rules or issue any instructions that are contrary to this Agreement.

This Agreement defines the entire relationship between the parties for the term of this Agreement and, except as herein specifically provided for, neither party shall during the term of this Agreement have any obligation to bargain with respect to any matter not covered by this Agreement nor concerning any change or addition hereto.

55

# ARTICLE XXV

## Termination of Agreement

Par. 1. This Agreement shall become effective on the Ninth day of July 2002, and shall terminate at midnight on the Eighth day of July 2007.

# EXHIBIT B

FORM NLRB-501
(11-94)

FORM EXEMPT UNDER 44 U S C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 1-CA-40447 | Date Filed 11/4/02 |

INSTRUCTIONS:
File an original and 4 copies of this charge with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

| 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT | | |
|---|---|---|
| a. Name of Employer Delta Beckwith Elevator | | b. Number of Workers Employed 150-200 |

| c. Address (street, city, State, ZIP, Code) 274 Southhampton Street Boston, MA 02118 | d. Employer Representative Todd Trnka | e. Telephone No. 617-824-5633 |
|---|---|---|
| | | Fax No. 617-427-8319 |

| f. Type of Establishment (factory, mine, wholesaler, etc.) Elevator Company | g. Identify Principal Product or Service Elevator Service |
|---|---|

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (list subsections) __(a)(5)__ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices.)

On or about October 14, 2002 and thereafter the employer unilaterally changed the terms and conditions of employment by failing to pay holiday pay to twenty-two bargaining unit employees.

By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number) International Union of Elevator Constructors, Local 4 | |
|---|---|

| 4a. Address (street and number, city, State, and ZIP Code) 424 Cambridge Street Allston, MA 02134 | 4b. Telephone No 617-783-3687 |
|---|---|
| | Fax No. 617-783-9331 |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

International Union of Elevator Constructors, AFL-CIO

6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By _____ (Signature of representative or person making charge) | Attorney (Title, if any) |
|---|---|
| | Fax No 617-742-2180 |
| Address Segal, Roitman & Coleman, 11 Beacon Street Suite 500, Boston, MA 02108 | 617-742-0208 (Telephone No.)    11/1/02 Date |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION
VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the matter of arbitration between:

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS

-and-

DELTA BECKWITH ELEVATOR COMPANY

Case Number: 11 300 03112 02

### AWARD OF ARBITRATOR

I.  The Company violated a longstanding part practice
when it failed to allow some IUEC Local 4
members holiday pay for Columbus Day in 2002.
The employees who were entitled to this holiday
pay pursuant to the longstanding past practice must
be made whole for the holiday pay denied them for
Columbus Day in 2002.

II. It was a violation of the 2002 - 2007 Master
Agreement for Local 4 to direct its members to turn
off or otherwise disable electronic communication
devices during their unpaid lunch breaks. Local 4 is
instructed to cease and desist from directing its
members to turn off or otherwise disable electronic
communication devices during their unpaid lunch
breaks.

*Robert M. O'Brien*
Robert M. O'Brien, Arbitrator
May 10, 2003

AMERICAN ARBITRATION ASSOCIATION

In the matter of arbitration between:

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS

-and-

DELTA BECKWITH ELEVATOR COMPANY

AAA Case No. 11 300 03112 02

Grievance: (1) **Employees not paid for the Columbus Day Holiday in 2002**

(2) **Local 4's directed employees to turn off or disable communication devices during their unpaid lunch breaks**

## STATEMENT OF THE ISSUE

At the hearing the parties agreed to two issues:

1. Whether the Company violated Article VI, Paragraph 2., of the collective bargaining Agreement, past practice and/or the Local Expense Agreement by failing to pay the Columbus Day Holiday to some IUEC Local 4 Members?

   If so, what shall be the remedy?

2. Whether the Union's directive to employees to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks violated the parties' collective bargaining Agreement?

   If so, what shall be the remedy?

## PERTINENT CONTRACTUAL PROVISIONS

### ARTICLE II
### Recognition Clause

**Par. 1.** The Union claims and the Employer acknowledges and agrees that the Union has supplied proof that a majority of its Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices have authorized the Union to represent them in collective bargaining with the Employer.

**Par. 2.** The Union recognizes that it is the responsibility of the Company in the interest of the purchaser, the Company and its employees to maintain the highest degree of operating efficiency and to continue technical development to obtain better quality, reliability, and cost of its product provided, however, that this provision is not intended to affect the work jurisdiction specified in Article IV and other Articles of the Agreement.

### ARTICLE VI
### Holidays

**Par. 1.** The following shall be designated as paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day.

**Par. 2.** In addition, each local may retain established unpaid holidays already agreed upon by past procedure or observed by local building trades councils or declared by State or National Governments. Any new Federal holidays such as President's Day and Columbus Day are not to be considered as paid or unpaid holidays unless previously celebrated by the parties to this Agreement.

### ARTICLE IX
### Contract Service

**Par. 1.** Contract Service is hereby defined as any contract obtained by the Company for regular examination or care of apparatus enumerated in Article IV and Article IV (A) of this Agreement and general repairs as indicated in Article VIII, Par. 2 for a period of not less than one (1) month. Contract Service Work shall be exclusively performed by

2

Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices. . . .

**Par. 3.** It is agreed the regular working day shall consist of eight (8) consecutive work hours, with an unpaid lunch period, between 6 a.m. and 6 p.m., five (5) days per week, Monday to Friday, inclusive. . . .

**Par. 8.** (a) Employees engaged in contract service work agree they will respond to call–backs outside of their regular work hours. The Company, the local union, and the employees shall meet and cooperate in establishing a callback system, which will cover such issues as a list of employees available on designated dates to respond to overtime call-backs, the number of employees on call-back at any given time, replacements for vacations and holidays, and trading of on-call duty. . . .

## MEMORANDUM OF AGREEMENT

This will confirm that during the negotiations for the collective bargaining agreement between the Company and the IUEC to be effective July 9, 2002, the parties agreed to the following. . . .

b) Employees on contract service shall be required to carry and use beepers or any other designated communication devices that permit them to be contacted and informed of an emergency call while the employee is on the way to work at the beginning of the work day and while the employee is on the way home from work at the end of the work day.

### *AGREEMENT ON EXPENSES*

### Local Union No. 4

### International Union of Elevator Constructors

AGREEMENT made the 21st day of December, 1981 by and between Local Labor Committee of the National Elevator Industry, Inc., and Local Union No. 4 of Elevator

Constructors for the purpose of establishing expenses allowances and rates for automobile mileage.

This Agreement becomes effective December 21, 1981, and shall remain in effect for a period of thirty (30) months, continuing thereafter as long as satisfactory to both parties. Sixty (60) days notice in writing shall be given by either party of their desire to change the Agreement and such written notice shall constitute cause for meeting of both parties. . . .

### Holidays

### October

Columbus Day – All States

Except Maine, Connecticut

### BACKGROUND

The International Union of Elevator Constructors (hereinafter referred to as IUEC or the Union) represents Elevator Constructor Mechanics, Helpers and Apprentices at most of the elevator and repair companies throughout the United States. These employees construct, repair, modernize and maintain elevators and escalators.

For many years, the major national elevator companies were represented in collective bargaining by the National Elevator Industry, Inc. (hereinafter referred to as NEII), a multi-employer bargaining association. NEII and the Union negotiated a series of collective bargaining agreements that were commonly referred to as Standard Agreements. These agreements were usually for a period of five (5) years. Smaller elevator companies signed short form, or "*me too*" agreements that for the most part replicated the Standard Agreement.

In 2002, the NEII did not represent the national elevator companies in contract negotiations. Rather, the IUEC negotiated directly with the four major elevator companies (Thyssen Krupp, Kone, Schindler and Otis) beginning in February 2002. They reached a common contract, known as the Master Agreement that was effective from July 9, 2002 to July 8, 2007.

North American Elevator Services (hereinafter referred to as NAES) owns several smaller elevator companies including the Delta Beckwith Elevator Company (hereinafter referred to as the Company or Delta Beckwith). The Company was former as a result of a merger in 1998 between the Delta Elevator Services Corporation (hereinafter referred to as Delta) and the Beckwith Elevator Company (hereinafter referred to as Beckwith).

NAES is a subsidiary of United Technologies, Inc. With minimum negotiations, NAES and the Union adopted the 2002 - 2007 Master Agreement that IUEC had negotiated with the four major national elevator companies. In fact, according to the President of the IUEC, negotiations were conducted over the telephone on one day. It is undisputed that paid holidays were not discussed during that telephone conversation. NAES adopted the 2002 - 2007 Master Agreement, which added Veterans' Day as a paid holiday.

Local Union No. 4 of the International Union of Elevator Constructors (hereinafter referred to as Local No. 4) represents approximately 180 employees at Delta Beckwith. Some 35 to 40 of these employees work in the field maintaining and repairing elevators and escalators. These contract service employees are assigned to the Company's approximately 40 service routes.

Delta Beckwith receives about 50 calls a day from customers reporting problems with their elevators. Most of these calls occur during regular service hours (8:00 a.m. to 5:00 p.m.). Approximately five (5) calls a day involve emergencies. Many of the Company's service contracts require it to respond to elevator shut downs within one (1) hour. Contract service employees are provided Nextel direct connect telephones and pagers to ensure that they can be reached to respond to service calls, so-called *"callbacks,"* from Delta Beckwith customers. The Company requires its contract service employees to keep these electronic communication devices on at all times during the working day.

The Standard Agreements negotiated by the NEII and the Union allowed local unions to negotiate special conditions, such as Local Transportation and Expense Agreements, provided that the wage rate in the Standard Agreement was not changed by any local negotiations. In 1981, Local 4 and the NEII negotiated an *Agreement on Expenses* that became effective on December 21, 1981. The 1981 *Agreement on Expenses* addressed local conditions such as mileage rates, parking reimbursement and travel zones.

The 1981 *Agreement on Expenses* also enumerated certain holidays to which Local 4 members were entitled depending in which New England state they were working. The Standard Agreements designated certain holidays for which employees were <u>paid</u>. The Standard Agreements also allowed local unions to retain established <u>unpaid</u> holidays already agreed upon by past procedures or observed by local building trades councils or declared by State or National Governments.

6

Local 4 retained the unpaid holidays set forth in the 1981 *Agreement on Expenses*. That Agreement could be changed with 60 days' written notice by either party. There is no evidence in the record that either party ever served such notice. Therefore, the 1981 *Agreement on Expenses* was in full force and effect when the current Master Agreement became effective on July 9, 2002.

Although the additional holidays which the Standard Agreements allowed local unions to retain were to be unpaid some employees of Delta and, to a lesser extent, some employees of Beckwith were, in fact, paid for some of these additional holidays, including Columbus Day. The Company was able to identify approximately 21 Local 4 employees who were paid for the Columbus Day holiday. According to the Union, some of these employees were granted paid holidays as an inducement to come to work with Delta or Beckwith; others were given paid holidays after achieving ten (10) years of service with Delta; and others were guaranteed 40 hours of pay a week by either Delta or Beckwith when they were hired and thus were paid for the holiday.

On May 30, 2002, the Company sent IUEC General President Dana Brigham a letter that was referenced "*MOA Expenses and Delta Beckwith Holidays*." Among other subjects, the Company informed the Union President that it had determined that certain Local 4 employees were receiving paid holidays in addition to the paid holidays provided by the national Standard Agreement. It declared that those additional paid holidays would be discontinued with the new national agreement.

The Company's May 30, 2002 letter was received at the IUEC General President's office where an office employee filed it. General President Brigham was

7

unaware of the letter until November 2002, some five months later, when a dispute arose at Delta Beckwith over the October 14, 2002, Columbus Day Holiday.

No Local 4 employee of Delta Beckwith was paid for the October 14, 2002, Columbus Day Holiday. On October 16, 2002, Local 4 asked the Company to reconsider its decision and negotiate this matter with it but the Company declined contending that the 2002 - 2007 Master Agreement terminated all past practices. Due to the Company's refusal to compensate employees for the Columbus Day Holiday, Local 4 directed Delta Beckwith's contract service employees to turn off their communication devices during their unpaid lunch breaks. Local 4 also advised these employees to reduce their unpaid lunch breaks from one hour to one-half hour.

On November 1, 2002, the Company's contract service employees honored Local 4's directive and reduced their unpaid lunch break form one hour to one-half hour and deactivated their Company furnished communication devices during their lunch break. Delta Beckwith claims that it made several attempts to contact contract service employees around noontime on November 1, 2002, but there was no response. That afternoon, the Company obtained a Temporary Restraining Order (TRO) in Federal Court prohibiting Local 4 from instructing its members to disable their communication devices during their lunch breaks.

On October 16, 2002, the Union filed a grievance in which it contended that Delta Beckwith violated Article VI, Paragraph 2., of the 2002 - 2007 Master Agreement when it did not pay employees for the October 14, 2002, Columbus Day Holiday. The grievance came before the undersigned Arbitrator for a hearing on February 24, 2003. At the outset of that hearing the parties agreed to two issues for the Arbitrator to decide.

8

Those issues are set forth above. Based on the extensive evidence and arguments advanced by the Union and the Company at the hearing and in their post-hearing briefs, this Arbitrator hereby renders the following decision.

## FINDINGS AND OPINION

I.    Whether the Company violated Article V, paragraph 2 of the collective bargaining Agreement, past practice and/or the Local Expense Agreement by failing to pay the Columbus Day Holiday to some IUEC Local 4 members?

### (A)    Columbus Day Holiday

There is no question that Columbus Day is not one of the eight paid holidays set forth in Article VI, paragraph 1., of the 2002 - 2007 Master Agreement. The Union contends that it was a paid holiday for Local 4 employees pursuant to the second sentence of Article VI, paragraph 2., but this Arbitrator respectfully disagrees.

The plain meaning of the second sentence in Article VI, Paragraph 2., is that if any holiday becomes a new Federal holiday it is not to be considered a paid holiday unless it was previously celebrated as a paid holiday by the parties to the Master Agreement. With some exceptions to be discussed below, Local 4 employees were never paid for Columbus Day. Therefore, Columbus Day did not become a paid holiday for Local 4 employees pursuant to Article VI, Paragraph 2., when it became a new Federal holiday.

Nor did Local 4's *Agreement on Expenses* state that Columbus Day was a paid holiday. Rather, it was an unpaid holiday pursuant to Article VI, Paragraph 2., which allowed local unions to retain *unpaid* holidays that were already agreed upon by past procedure or observed by local building trades councils or declared by State or National

9

Governments. The evidence is uncontroverted that Columbus Day was never celebrated as a paid holiday for most Local 4 members. Therefore, it was an unpaid holiday for these employees in 2002.

While Columbus Day was never a paid holiday for the majority of Local 4 employees at the Company, it was a paid holiday for approximately 22 members of Local 4. Prior to 1998, Delta Elevator Service and, to a lesser extent, Beckwith Elevator Company did compensate some of their Local 4 employees for the Columbus Day Holiday for a myriad of reasons. Some of these employees were paid for the holiday as part of a 40 hour guaranteed workweek. Others were granted this benefit when they acquired 10 years of service at Delta. Still other Local 4 employees were paid for the holiday as an inducement for them to come to work at either Delta or Beckwith. And one employee was allowed this benefit when he agreed to transfer from maintenance to adjusting duties.

When Delta and Beckwith merged in 1998, these employees continued to be paid for Columbus Day until 2002 when the Company discontinued this benefit. For these employees, a paid holiday for Columbus Day became a term and condition of their employment.

That this paid holiday was not a benefit negotiated on behalf of these employees by Local 4 is immaterial, in this Arbitrator's opinion. Delta Beckwith and its predecessors willingly compensated these employees for the Columbus Day Holiday for a considerable period of time. Indeed, some of them had been paid for Columbus Day continuously sine the 1970's. This longstanding benefit became a term and condition of

their employment even though it was not rooted in contract negotiations between Local 4 and their employers.

(B)    <u>The May 30, 2002 Letter</u>

The Company argues that even if a past practice existed regarding holiday pay for Columbus Day, the May 30, 2002, letter that Regional General Manager Belcher sent to IUEC General President Dana Brigham served to terminate any such practice effective with the expiration of the predecessor collective bargaining agreement on July 8, 2002.

It is unclear from the May 30, 2002, letter precisely what Regional Manager Belcher intended when he sent this letter to IUEC's General President. The letter referenced a *"MOA Expenses and Delta Beckwith Holidays."* There was a line for Mr. Brigham's agreement. However, Mr. Brigham never signed the document.

One could infer from this that the letter was a <u>proposal</u> by the Company to discontinue additional paid holidays beyond those in the Standard Agreement. If that was Mr. Belcher's intent then the General President would be required to concur by affixing his signature to the document and it would be appended to the 2002 – 2007 Master Agreement in the same manner that some nine other bilateral agreements were incorporated into the Master Agreement. That did not happen, however, and no such Memorandum of Agreement was appended to the Master Agreement.

Mr. Belcher did not testify in this arbitration proceeding so we do not know his subjective intent. It is undisputed that he did not have any discussions with General President Brigham about the letter before the Master Agreement was executed on or about July 9, 2002. In fact, General President Brigham was unaware of the document

11

until November 2002, after the disagreement arose between Local 4 and Delta Beckwith over pay for the Columbus Day Holiday on October 14, 2002.

Assuming that the May 30, 2002, letter was intended to discontinue the practice of compensating some Delta Beckwith employees holiday pay in addition to the paid holidays set forth in the Master Agreement the letter was ineffectual in terminating this practice, in this Arbitrator's opinion, since it was sent to the wrong party.

The practice of allowing some Delta Beckwith employees holiday pay in addition to the paid holidays provided by Article VI, paragraph 1., of the Master Agreement had nothing to do with the International Union of Elevator Constructors. Rather, it was simply a local practice that evolved at both Delta and Beckwith companies since the 1970's. The practice was continued when these two companies merged in 1989. Since the practice was limited to some Local 4 employees it was Local 4 that the Company was obligated to notify if it wished to discontinue allowing these employees paid holidays in addition to those required by the Master Agreement.

That Local 4 was not notified by the Company of its desire to terminate paid holidays in addition to those provided by the Master Agreement is undisputed. There were no local option negotiations between Local 4 and Delta Beckwith in 2002 where this matter could have been discussed. Local 4 was never afforded the opportunity to respond to the Company's desire to eliminate additional paid holidays until _after_ the Columbus Day Holiday on October 14, 2002.

For all the foregoing reasons, this Arbitrator finds that the Company violated a longstanding past practice when it failed to allow some IUEC Local 4 members holiday pay for Columbus Day in 2002. Therefore, the employees who previously had been paid

12

for this holiday pursuant to the longstanding past practice must be made whole for the holiday pay denied them for Columbus Day in 2002.

II.    Whether the Union's directive to employees to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks violated the parties' collective bargaining Agreement?

A Memorandum of Agreement incorporated into the 2002 - 2007 Master Agreement requires employees on contract service to carry designated communication devices while on the way to work at the beginning of the workday and while on the way home at the end of the workday. However, no provision in either the Master Agreement or the Local 4 *Agreement on Expenses* specifically requires contract service employees to keep designated communication devices activated during their unpaid lunch breaks. Nevertheless, it is this Arbitrator's opinion that it was management's prerogative to require its contract service employees to keep their designated communication devices on at all times during their regular working day so that they could be contacted to respond to callbacks.

In Article II, paragraph 2., of the Master Agreement the Union recognized that it was management's responsibility to "[m]*aintain the highest degree of operating efficiency.*" Implicit in this responsibility is the Company's obligation to promptly respond to callbacks from customers at all times, including times when contract service employees are on their lunch breaks.

It is unnecessary to decide whether the July 28, 1992, grievance settlement between the IUEC General President and the NEII Executive Director imposed an obligation on all IUEC employees nationwide to utilize communication devices whenever required to do so by their employer since it was a well established practice at Delta

Beckwith for contract service employees to keep their designated communication devices on during their lunch breaks.

Like pay for the Columbus Day Holiday for some Delta Beckwith employees the practice of contract service employees keeping their designated communication devices active during their lunch breaks became a term and condition of their employment that could not be unilaterally terminated.

That contract service employees are not compensated for their lunch breaks did not relieve them of the obligation to maintain contact with the Company during their lunch breaks to be available to respond to callbacks. The Company must promptly respond to service calls from its customers for obvious reasons. It is immaterial that there were alternatives available to the Company to respond to callbacks from customers. It was management's prerogative to require contract service employees in the field to respond to callbacks during the regular workday, including calls received during the contract service employees' lunch breaks.

For all the foregoing reasons, this Arbitrator finds that it was a violation of the 2002 – 2002 Master Agreement for Local 4 to direct its members to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks. Local 4 is instructed to cease and desist from directing its members to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks.

## AWARD

I.     The Company violated a longstanding past practice when it failed to allow some Local 4 IUEC members holiday pay for Columbus Day in 2002. The employees who were entitled to this holiday pay pursuant to the longstanding past practice must be made whole for the holiday pay denied them for Columbus Day in 2002.

II.    It was a violation of the 2002 – 2007 Master Agreement for Local 4 to direct its members to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks. Local 4 is instructed to cease and desist from directing its members to turn off or otherwise disable electronic communication devices during their unpaid lunch breaks.

_Robert M. O'Brien_
Robert M. O'Brien, Arbitrator

Dated:    May 10, 2003

15



PATRICIA SABALIS
psabalis@drm.com
Fax: (802) 862-7512

January 14, 2004

VIA FEDERAL EXPRESS

Tony Anastas, Clerk of Court
U.S. District Court for the District of
Massachusetts
1 Courthouse Way
Boston, MA  02210

Re:    Francis E. Dybes, and Others Similarly Situated v. Delta Elevator Service Corporation
       d/b/a Delta/Beckwith Elevator Company
       C.A. File No. 04 CV 10076 MLW

Dear Clerk Anastas:

Enclosed for filing with the Court is Defendant's Motion to Dismiss and a Certificate of Service.

Please feel free to contact me if you have any questions.

Sincerely,

Patricia M. Sabalis

Encs.

cc w/encs.:  Michael J. Doheny, Esq.